UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

EDWIN R. WHITAKER,                    )
       Plaintiff,                )
                  )
v.                                     )          NO. 2:10-CV-260
                  )
VERIZON WIRELESS,                      )
       Defendant.                )

## MEMORANDUM OPINION AND  ORDER

The plaintiff, Edwin R. Whitaker, filed the complaint in this case alleging retaliatory discharge pursuant to Tennessee Code Annotated § 50-1-304, and Tennessee common law retaliatory discharge.  The defendant has filed a motion for summary judgment , [Doc. 23], and the plaintiff has filed a response. [Doc. 25].   This matter has been  briefed and is ripe for disposition.

### Undisputed Facts Submitted By The Defendant[1]

1.     Verizon Wireless is a nationwide wireless service provider with retail stores throughout the country, including one in Morristown, Tennessee.  Declaration of Karen Bear ("Bear Decl.") at ¶ 3; Declaration of Jennifer Dennard ("Dennard Decl.") at ¶ 3.

2.     Verizon Wireless hired Plaintiff on August 23, 2004 as a Representative – Retail Sales.  Deposition of Edwin Whitaker ("Whitaker Dep.") at 39.

3.     During his employment, Plaintiff received a copy of Verizon Wireless' Code of Conduct.  Whitaker Dep. at 40-41, Exhibit 2.

---

[1]   The Plaintiff failed to specifically respond to the Defendant's  statement of undisputed facts.

1

4.      Plaintiff read and understood the Code of Conduct. Whitaker Dep. at pp. 40-41.

5.      Plaintiff also understood he was responsible for enforcing the Code of Conduct as it related to his subordinate employees.  Whitaker Dep. at  209-210.

6.      Verizon Wireless' Code of Conduct includes a Workplace Violence Policy, which states:

> We all deserve to work in an environment that is free from violence or hostility. Verizon Wireless will not tolerate any threatening, hostile or abusive behavior by employees in the work place, while operating company vehicles or on company business or by any persons on company property, and will take immediate and appropriate action against offenders, up to and including termination of employment and referral for criminal prosecution.

Whitaker Dep. at 217, Exhibit 2.

7.      On July 1, 2008, Verizon Wireless promoted Plaintiff to Manager-Retail Sales at its store in Morristown, Tennessee.  Whitaker Dep. at 57, 113; Dennard Decl. at ¶ 4.

8.      As manager of the Morristown store, Plaintiff initially reported to Assistant District Manager Jaren Starnes and District Manager Rich Bulger.  Whitaker Dep. at 55.

9.      At the time Plaintiff was promoted, Plaintiff was friends with Mr. Starnes and Mr. Bulger.  Whitaker Dep. at 57-59.

10.      In 2009, Plaintiff had a heated discussion with Mr. Starnes in which he cursed at Mr. Starnes over the phone.  Whitaker Dep.  at 151.

11.      Specifically, Mr. Starnes called Plaintiff to determine why Plaintiff did not have a manager opening the store. Whitaker Dep. at 150-51.

12.      Plaintiff told Mr. Starnes "What the hell do you want me to do about it, Jaren?  I can't get there today."  Whitaker Dep. at 151.

13.      Plaintiff admits he lost his temper with Mr. Starnes.  Whitaker Dep. at 151.

2

14.     Following this conversation, Mr. Bulger contacted Plaintiff and told him he needed to "watch [his] temper." Whitaker Dep. at 152.

15.     On November 4, 2009, Mr. Bulger sent Plaintiff [to] a Counseling Session for "[i]nappropriate behavior and conduct" in connection with the incident with Mr. Starnes. Whitaker Dep. at 152, Exhibit 10.

16.     The Counseling Session states that, "Edwin is expected to treat all leadership, employees and customers with dignity and respect.  In addition, Edwin is expected to communicate in a professional [sic] to all employees and customers." Whitaker Dep. at Exhibit 10.

17.     The Counseling Session further required "[i]mmediate adherence to the Code of Business Conduct and all policies and procedures as set forth by Verizon Wireless." Whitaker Dep. at Exhibit 10.

18.     After the incident which resulted in Plaintiff being issued a Counseling Session, Plaintiff claims Mr. Starnes visited the store and asked him to engage in sales practices, which Plaintiff refers to as "slamming," and which Plaintiff thought were inappropriate under Verizon Wireless' Code of Conduct.  Whitaker Dep. at 119, 149, 153.

19.     In particular, Plaintiff claims Mr. Starnes instructed him to charge a $50 replacement fee on all replacement devices regardless of whether the device was under warranty. Whitaker Dep. at 119-20.

20.     Plaintiff claims the customers should not have always been charged the $50 fee if the device was under warranty and met certain specifications under company policy.  Whitaker Dep. at 120, 124, 127-28.

21. Plaintiff claims Mr. Starnes instructed him to charge the $50 fee as accessories to boost the store's sales numbers on accessories. Whitaker Dep. at 120.

22. Plaintiff claims he informed Mr. Starnes that charging the $50 as accessories would "mess up" the store's inventory. Whitaker Dep. at 129.

23. Plaintiff claims that, in response to his concerns about inventory, Mr. Starnes instructed him to give the customers the accessories and tell them they were "free." Whitaker Dep. at 130.

24. Plaintiff admits that the customers were informed they were being charged the $50 fee. Whitaker Dep. at 130.

25. Plaintiff claims he refused to engage in this practice and he and Mr. Starnes had a "heated" discussion. Whitaker Dep. at 120.

26. Plaintiff admits Mr. Starnes did not present the proposed sales practice as an ultimatum. Whitaker Dep. at 133.

27. Specifically, Plaintiff testified that:

Q. Did he say you need to do it or else?
A. No. I mean, there was no ultimatum put on it.

Whitaker Dep. at 133.

28. Plaintiff never told Mr. Starnes that he thought the proposed sales practice was illegal. Whitaker Dep. at 133-34, 252-53.

29. Plaintiff admits he does not know whether the proposed sales practice violates the law. Whitaker Dep. at 133-34.

30. Plaintiff admits he does not know whether the proposed sales practice violates public policy. Whitaker Dep. at 134.

4

31.     In particular, Plaintiff testified that:

Q.      Did you say I think that's a violation of the law or a violation of
        the --
A.      I don't know the law.  All I said, it's -- it's unethical.  I mean, to
        me that's unethical.  I don't know to what extent, law-wise I don't
        know, but I think if there's a valid option every customer should be
        presented with every valid option.  Let them choose.  We don't
        make up their minds for them.
Q.      So you don't know if it violates any type of state or federal law or
        public policy or anything like that?
A.      No. How should -- I'm sorry.

Whitaker Dep. at 133-34.

32.     Plaintiff further testified that:

Q.      So did you say it was unethical and illegal?
A.      I said -- I said it was definitely unethical.  As far as illegal, I -- I don't --
        maybe that word was misused in that one.
        …
Q.      So we have -- so it would be fair to cross off the illegal part of the
        complaint?
A.      Fair enough.

Whitaker Dep. at 253.

33.     Plaintiff claims that, after leaving Plaintiff's store, Mr. Starnes called Plaintiff to

apologize about "getting heated." Whitaker Dep. at 136.

34.     Plaintiff claims Mr. Starnes also told Plaintiff that Plaintiff "was probably right"

and "it was a right call" not engage in the practice.  Whitaker Dep. at 136.

35.     Plaintiff further claims Mr. Starnes said "I understand you not wanting to do

something like that."  Whitaker Dep. at 154.

36.     Plaintiff also claims Mr. Starnes asked him to charge customers $10 for moving

their contacts from an old phone to a new one, but to ring the $10 up internally as 10 accessory

items for $1.00 each.  Whitaker Dep. at 138-39.

5

37.      Plaintiff admits that the customers were required to pay the $10 for moving their contacts and that the customers were aware of the charge.  Whitaker Dep. at 138-39.

38.      Plaintiff claims that, by ringing up the $10 as accessories, this proposed sales practice would create an internal accounting issue and boost accessory numbers in violation of Verizon Wireless' Code of Conduct.  Whitaker Dep. at 139-40.

39.      Plaintiff claims he told Mr. Starnes he did not want to engage in this proposed sales practice.  Whitaker Dep. at 140-41.

40.      Plaintiff claims Mr. Starnes responded "okay, no big deal."  Whitaker Dep. at 141.

41.      Plaintiff admits Mr. Starnes never asked him to engage in the proposed sales practices again.  Whitaker Dep. at 136-37.

42.      Plaintiff further testified that he and Mr. Starnes later joked, snickered and laughed about Mr. Starnes' proposed sales practices to boost accessories numbers.  Whitaker Dep. at 292-94.

43.      Plaintiff also testified that:

> Q.      If you go with me to paragraph 16 of the complaint, the other document, yeah.  Okay, you write in the second – we talk about the end of November.
> A.      Uh-huh.
> Q.      "Starnes came to the store and told plaintiff of changes he wanted to implement to the district."  Correct?
> A.      Yes.
> Q.      Plaintiff agreed with some and disagreed with some, and particularly one that implicated the use of slamming.  So that's not correct is it?
> A.      No.  I mean -- well, no, we brought it up about it, but, no, that was not correct.  That should not be in there.  There was nothing implicating slamming at that time.  The only thing, you know, we did talk about was the -- it was brought back up about his

6

accessories before. We kind of -- kind of joked about it. But it
wasn't brought up as far as to do this.

Q. Okay. So that should --

A. Yeah.

Q. -- removed from paragraph 16?

A. Yeah.

Whitaker Dep. at 292-93.

44.     Plaintiff discussed Mr. Starnes' proposed sales practices to boost accessories numbers with Mr. Bulger, who was the District Manager at the time. Whitaker Dep. at 215-16.

45.     Mr. Bulger agreed that the proposed sales practices to boost accessories numbers were "not a good idea." Whitaker Dep. at 215-16.

46.     Plaintiff never reported the alleged inappropriate sales practices to anyone other than Mr. Bulger. Whitaker Dep. at 211-16.

47.     Plaintiff claims that, after Mr. Starnes presented him with the proposed sales practices to boost accessories numbers, Mr. Starnes later came to him with "legitimate decent ideas." Whitaker Dep. at 146-47.

48.     Plaintiff claims he told Mr. Starnes that some of these legitimate, decent ideas were good, but that he did not know about others. Whitaker Dep. at 147.

49.     Plaintiff claims Mr. Starnes stated that Plaintiff was trying to undermine him and felt like Plaintiff was "going against his wishes." Whitaker Dep. at 146-48.

50.     Plaintiff admits Mr. Bulger never told him to engage in any sales practices that he believed were inappropriate. Whitaker Dep. at 116.

51.     Plaintiff believes Mr. Bulger acted ethically and consistently with Verizon's Code of Conduct as it related to sales practices. Whitaker Dep. at 117.

52. On December 3, 2009, Verizon Wireless Human Resources Consultant Jennifer Dennard received a complaint that Plaintiff had placed his hand on an employee, Cody Williams, in a threatening manner. Dennard Decl. at ¶ 5.

53. Ms. Dennard contacted Mr. Williams who told her that Plaintiff had placed his hands on the back of his neck, applied pressure, and stated "My business is my business, you stay out of it." Dennard Decl. at ¶ 6.

54. Ms. Dennard believed this conduct violated Verizon Wireless' Workplace Violence Policy and Code of Conduct. Dennard Decl. at ¶ 7.

55. Ms. Dennard recommended that Plaintiff be suspended pending an investigation into Mr. Williams' allegations. Dennard Decl. at ¶ 8.

56. Ms. Dennard discussed the proposed suspension with Assistant Director, Human Resources Karen Bear. Dennard Decl. at ¶ 8; Bear Decl. at ¶ 4.

57. Ms. Dennard visited Plaintiff's store on December 4, 2009 and interviewed Mr. Williams, as well as other employees present that day. Dennard Decl. at ¶ 9.

58. During his interview, Mr. Williams told Ms. Dennard that, while Mr. Starnes was visiting the store on November 28, 2009, Mr. Williams had made a comment about Plaintiff's absences in front of Mr. Starnes. Dennard Decl. at ¶ 10.

59. Mr. Williams told Ms. Dennard that, after he made the comment, Plaintiff grabbed him by the back of his neck and said "My business is my business, stay out of it." Dennard Decl. at ¶ 11.

60. Mr. Williams told Ms. Dennard he felt threatened by Plaintiff's conduct. Dennard Decl. at ¶ 11.

8

61.     On December 5, 2009, Ms. Dennard interviewed Plaintiff by telephone. Dennard Decl. at ¶ 12.

62.     During the interview, Plaintiff initially denied putting his hands on Mr. Williams. Whitaker Dep. at 161, 174; Dennard Decl. at ¶ 13.

63.     Later during the interview, Plaintiff admitted that he put his hand on Mr. Williams' shoulder, leaned into his ear, and whispered "those are not comments … you make to your district manager." Whitaker Dep. at 161, 166, 198.

64.     Ms. Dennard believed that Plaintiff's conduct violated Verizon Wireless' Code of Conduct. Dennard Decl. at ¶ 14.

65.     Ms. Dennard recommended that Plaintiff be terminated based on his conduct in placing his hands on Mr. Williams and making a threatening statement.  Dennard Decl. at ¶ 14, Exhibit 1.

66.     Mr. Starnes also recommended that Plaintiff be terminated.  Dennard Decl. at ¶ 15.

67.     Ms. Dennard sent the recommendations for terminations to Ms. Bear, who agreed that termination was warranted under the circumstances.  Dennard Decl. at ¶ 16; Bear Decl at ¶ 5.

68.     Verizon Wireless terminated Plaintiff on December 12, 2009. Whitaker Dep. at 7, 284.

69.     Plaintiff never informed Ms. Dennard about Mr. Starnes' proposed slamming practices. Dennard Decl. at ¶ 17.

70.     Plaintiff admitted that it is a violation of Verizon Wireless' Code of Conduct to put hands on employees.  Whitaker Dep. at 178.

71.     However, Plaintiff claims that he did not violate the Code of Conduct when he put his hand on Mr. Williams because, from his perspective, "there was no violence or hostility by the actions."  Whitaker Dep. at 217-18.

72.     Plaintiff admits Mr. Williams could have had a different perspective.  Whitaker Dep. at 218.

73.     Specifically, Plaintiff testified that,

Q.      Do you think Mr. Williams could have had a different perspective?
A.      Obviously he did, and it accounts for his perspective.
Q.      So it would be fair to say that perhaps Mr. Williams -- even  though you have a different perspective, that perhaps Mr. Williams by virtue of what occurred that day did feel that he was subject to hostile, abusive behavior?
A.      I can't answer that. I can't answer what he felt, I mean.

Whitaker Dep. at 218.

74.     Plaintiff admits that, if he had put his hands on Mr. Williams as Mr. Williams described it, it would be a violation of Verizon Wireless' Code of Conduct. Whitaker Dep. at 206.

75.     Plaintiff admits he does not know why he was terminated. Whitaker Dep. at 155.

76.     Plaintiff admits he does not know who made the termination decision.  Whitaker Dep. at 205-06.

77.     Plaintiff testified that he "assume[es] it was a -- this Cody Williams thing where I supposedly choked an employee." Whitaker Dep. at 155.

78.     In particular, Plaintiff testified that:

Q.      So why do you think you were terminated?

A.    It never was a hundred percent disclosed to me, but I'm -- I'm assuming it was a -- this Cody Williams thing where I supposedly choked an employee.

Whitaker Dep. at 155.

79.    Plaintiff also testified that:

Q.    Do you think the reason you got fired is because you refused to engage in slamming?
A.    Possibly, yes. I think that had very -- a lot to do with it, quite a bit. I mean, primarily I think that's what brought everything to fruition.
Q.    Do you think it had anything to do with the Cody Williams situation?
A.    It could have been. I mean, I think that maybe Jaren's -- I don't know who -- who brought the HR in, if Jaren asked for it, if Cody asked for it. I do know this, that if Rich would have still been there I -- I don't feel like I'd be sitting here across from you with this situation. Rich would have, you know -- been a different story.

Whitaker Dep. at 259-60.

80.    Plaintiff further testified that:

Q.    Well, you say [in your Complaint] that you felt that Starnes was looking for a reason to terminate you with the underlying reason being your refusal to engage in the slamming. I think what you're saying is that -- and tell me if I'm wrong. Are you saying that you thought Starnes' behavior towards you with regard to the key holder situation --
A.    Not just that, everything. All this -- this -- this conglomerate of things that happened within that short time span. I just felt like he was -- he didn't want me there any more.
      …
Q.    For all the reasons?
A.    Well, I mean for that, for -- for the things that -- you know, other things that I knew about him that he had done behind the scenes, you know, just -- I felt like --
Q.    Like what?
A.    When we were going out, he would -- for example, he'd take his ring off, you know, where he was married, like I was going to use that against him or something. I mean that happened. So just things like that. I felt like I was sort of a -- not an asset to him, more of a hindrance I guess you could say. I could potentially be that. I don't know.

11

Whitaker Dep. at 256-57.

**Undisputed Facts Submitted By The Plaintiff[2]**

1.    Verizon is a nationwide wireless service provider with retail stores throughout the country. It has several in East Tennessee, including Morristown, Greeneville, Johnson City, and Sevierville, and also in Bristol, Virginia. (Dennard Dep. pp. 3, 23.)

2.    Whitaker was employed by Verizon as a part-time sales representative at a sales outlet in Kingsport. (Whitaker Dep. p. 39.) In this position and in all positions he held thereafter, Whitaker and others in like positions were paid in part by commission based on sales. (Whitaker Aff. ¶ 86.) He was then 23 years old. (Whitaker Dep. p. 34.)

3.    Whitaker was promoted to supervisor on a full time basis at that store, in which position he served for nine months. (Id. 39-40.) He then became assistant manager of the Bristol store. (Id. 41.) He later became manager of the Bristol store. (Id. 44.) Bristol was a "C" level store. (Id. 59.) After a year, Whitaker was made manager at Morristown, a larger "A" level store. This was another promotion. (Id. 54-55.)

5.    Whitaker's friendship with Starnes paled. While they had had disagreements in the past, Whitaker acknowledges that beginning with the following incident their relationship became strained, or as he testified, the incident was the first "bump in the road." (Id. 149.)

6. The incident occurred in September or October, 2009. It is referred to in paragraphs 10-17 in Verizon's material statement of undisputed facts, but as there stated the undisputed underlying circumstances are not disclosed. Whitaker was scheduled to be off work on the day of the incident, and his wife, a nurse, was scheduled to be at work. Whitaker then had three

---

2   Gaps in numbers reflect facts that were disputed.

12

assistant managers. One was on vacation. One was to open and one was to close the store. The evening before Whitaker's day off the assistant manager scheduled to close underwent emergency surgery. Upon learning of this, Whitaker assigned the other assistant manager to close the store and handle the day's receipts. A "key holder" – a backup employee was assigned to open. When Starnes learned of this, he called Whitaker at his home to insist that he go to the store. Whitaker was alone at home with a sick infant child. The child had been born without a rectum and had undergone four surgeries, and had just had open heart surgery. When Starnes called, Whitaker was in the midst of having to dilate the child. There was no way he could leave the child. Whitaker wanted to call Starnes back and though Starnes was told the circumstances, he nevertheless went on to insist that Whitaker go to the store. Whitaker's response to Starnes was, "What the hell do you want me to do about it, Jaren?" Starnes got mad and hung up. (Whitaker Dep. 149-152.)

8.     Starnes wanted the Plaintiff written up for the incident and spoke to his superior, Rich Bulger. Bulger told the Plaintiff "he kind of disagreed with it, under the circumstances," (Whitaker Dep. p. 152.), but sent him an undated, unsigned write-up and told Whitaker "you can either sign this and get back to me or whatever happens happens." Whitaker never signed it, and nothing further came of the incident or the write-up until this litigation. (Id. at 153.)

9.     Whitaker, prior to the above incident, had never been written up and told Bulger he felt his actions in the matter were justifiable. (Id.)

10.     When Whitaker took over the Morristown store, he found representatives engaging in practices he felt were unethical. Some caused the customers to pay an additional amount for questionable services, replacements or accessories. Other practices failed to make

known company approved options which, if known, would have enabled the customers to have obtained a service or product at a lesser price. (Whitaker Dep. 74-90.)

11.  Asked if the practices were illegal, the plaintiff said he did not know what the law was, but he believed they were unethical. (Id. 76, 88.)

12.  In the fall of 2009 after Whitaker supposedly cussed Starnes, they had a heated argument over a plainly illegal practice in which Starnes wanted Whitaker to engage through his representatives. The argument is referred to in defendant's undisputed material facts 18 through 41. (Whitaker Dep. p. 131.) Whitaker said it was possible the argument came shortly before the key holder incident. (Id. 222.)

13.  Starnes told him, "I don't care what it takes" to increase sales. (Whitaker Dep. p. 122.)  Starnes' proposal was with regard to the replacement of phones or devices. If under warranty and the product didn't work there was to be no charge, unless the product was damaged. If out of warranty there would be a fifty dollar charge. Starnes proposed that fifty dollars be charged even if the product was under warranty and assign the charge as a sale of accessories. Whitaker refused to do it. (Id. 119-120; 122-124.)

14. Whitaker was questioned thusly. (Id. 126-127)

Q.  The customer knows he paying that $50; correct?
A.  Yes.
Q.  So the customer is not being deceived or lied to?
A.  Yes.
Q.  Correct?
A.  You know, he's told him he's being paid a replacement device fee and he's getting the accessories is how he pitched it. So   they're being completely deceived.

15. And further (Id. 126-27.)

Q.  But

14

> A. There's no accessories leaving the store. The customer is paying $50, accessory numbers are going up. And I told him, Jaren, first of all it's going to mess up inventory because you're charging for accessories that are still going to be in inventory.
>
> Q. Okay. But why would the -- if the customer is going to pay $50 regardless, why does it matter with the customer how it's being rung up internally?
>
> A. Because they're -- they're paying $50 for something they're not taking home, and they shouldn't have been charged $50 period. That's what I'm trying to tell you, it's under warranty.
>
> ***
>
> I know our -- if it was under warranty, we were not to charge a $50 replacement device fee. So if your screen just went out under -- under twelve months and you came in and your phone was good, there's no water damage, no physical damage, we take your phone in, we can't fix it, we swap it out, give you a brand new replacement device free of charge, because you as a customer deserve that.

16. Whitaker told him, "I'm not doing it, there's no way, you know, it's not going to happen." It was then the exchange became heated. (Id. 132.)

17. Again, in his deposition Whitaker was asked if this would violate the law. He replied, "I don't know the law. All I said, it's -- it's unethical." (Id. 133.)

18. This happened in a face-to-face meeting. Starnes left upset because of Whitaker's refusal. (Id. 133.) Later that day Starnes called Whitaker to apologize. (Whitaker Dep. p. 136.)

> Well, he apologized about it getting heated and by me not agreeing with it, and after talking to Rich he said, you know, I was probably right, it was a right call, you know, you know, kind of that effect.

21. Starnes told Whitaker he had related his concerns to Bulger. (Id. 133) Bulger had no recollection that Starnes had told him of this argument. (Bulger Dep. p. 48.)

22.     The incident involving Cody Williams came soon thereafter on November 28, 2009. Williams had become a Verizon employee as a result of merger and had been assigned to the Morristown store under Whitaker. Williams brought with him a record of poor attendance and his attendance continued to be poor at Morristown. As Whitaker put it, Williams had a "huge problem" with his attendance that both he and Bulger had addressed. Williams' frequent emergency short notice absences came to be called "Cody days" by the other employees. By the time Williams made his complaint to Human Resources, Williams was on a second or third write up for attendance and had had a "final meeting" on the subject with Whitaker. (Whitaker Dep. pp. 156-161.)

23.     Starnes was at the Morristown store on November 28. In leaving, Starnes and Whitaker walked to the rear of the store and came upon Williams who was seated, eating lunch. As they passed, Williams said ". . . you're lucky I was here today. I almost took a Cody day."  At that point Starnes looked at Whitaker as though to say "what's that mean." (Id. 164.)

24.     And again, Whitaker testified of what Williams said to Starnes and him (Whitaker Dep. p. 166):

> Well, he just threw out this outlandish comment, you know, and Jaren was like, what? And I said, you know, we'll talk about it outside, and that's when I leaned in and I said, those are not comments that, you know, you make to your district manager

25.     Because Williams was seated and there was a chair on one side of him and a large coffee machine on the other, and because Williams didn't want the others to hear what he said, he leaned in, put his hand on Williams' shoulder and whispered in Williams' left ear. (Id. 168-171.)

26.     When Whitaker was asked why he put his hand on Williams, he said (Id. 179.):

> To lean in, because when I leaned in to there, there was no where
> else to lean into the situation to his ear because there was a chair to
> the left, and the -- and the coffee machine was to the right. So I
> leaned into him and put my hand on his shoulder to come into the
> side, just like we would touch anybody if you want to whisper in
> their ear.

27.    Williams made a complaint to Human Resources. Jennifer Dennard investigated

the complaint. Williams told her Whitaker had placed his hand on the back of his neck and

stated, "My business is my business, you stay out of it." (Dennard Decl. ¶ ¶ 7, 11.) Williams told

her he felt threatened. (Id. ¶ 11.)

28.    According to Ms. Dennard, Williams told her that his comment to Starnes and

Whitaker was that they were lucky Whitaker hadn't taken a "Cody day". (Defendant's

undisputed fact No. 58.)

29.    In fact, Williams' "funny" remark was that he (Williams) was thinking of taking a

"Cody day." (See above paragraphs 23, 24.) Whitaker also testified (Whitaker Dep. p. 162.)"

> So when he said that in front of Jaren that he was thinking about
> taking a Cody day, Jaren looked at me like what does that mean,
> you know, I said, I'll explain it to you later, and I leaned down to
> his shoulder, where there was other employees present because I
> didn't want to yell it, in the back or say it out loud, you know, and
> I leaned over and said, you know, those are things we don't talk
> about in front of your district manager and those are not things to
> be joking about, especially in front of me or your boss's boss.

31.    Whitaker was told by Starnes on a Friday after the complaint he was suspended.

Whitaker asked what it was about and Starnes said it was nothing he could disclose. (Id. 194.)

On the day before Starnes had called him to tell him not to come in because Ms. Dennard was

doing some interviews. When Whitaker asked, "is everything ok," he said, "everything is fine,

no big deal; you know, I'll see you Monday." (Id. 159.)

32.     Ms. Dennard asked Whitaker if he had ever put his hands on an employee. Whitaker said, "no, I've never hit an employee." (Id. 174.) Then she said, "so you mean to tell me you never choked Cody Williams." And Whitaker said, "absolutely not." (Id. 175.) It was then Whitaker understood she was asking about his encounter with Williams, and Whitaker went on to described the matter to Ms. Dennard: "What I told you before." (Id. 175; 196-198.) Ms. Dennard told him only that what had happened "was inappropriate." (Dennard Dep. p. 26.)

33.     Ms. Dennard and Starnes recommended Whitaker's discharge and his discharge followed on December 12, 2009. Starnes notified Whitaker of his discharge. Whitaker asked him why. Starnes told him he could not comment on it but went on to tell Whitaker that he had no lawsuit against the company but perhaps he had a suit against Williams. (Whitaker Dep. pp. 283-284.)

34.     In her deposition Ms. Dennard stated that she had reviewed documents that related to the matter, but from thereon her mind was all but blank. She couldn't recall who notified her of the complaint. But then after saying a subordinate of Whitaker notified her, she couldn't recall whether the person was male or female. She said she interviewed employees. She could only "vaguely" remember what anyone told her, but that "not specifically." She remembers interviewing Whitaker by phone and that he had "placed his hands on Mr. Williams' shoulder." Asked if she had ever fired anybody for putting his hand on an employee's shoulder she answered, "I'm not sure." (Dennard Dep. pp. 6-14.) She was aware of Williams' absences and said she had previously investigated his attendance. (Id. 19.)

35.     Ms. Dennard said she had never had a complaint of slamming. She said any form of slamming would be a violation of the Verizon Code of Conduct. Asked if it would require termination, she said "it would depend." (Dennard Dep. pp. 25-26.)

36.     Ms. Dennard had had occasion to discipline employees in East Tennessee for code violations.  (Dennard. Dep. pp. 23-25.) Moreover, one of Whitaker's employees was found to have engaged in a sexual relationship with a subordinate in specific violation of the code. Nevertheless, he was not fired but rather was transferred to the Sevierville store. At Sevierville he was found to have engaged in three code violations. The manager recommended his discharge as did Bulger. Nevertheless, the employee was retained on final warning. (Whitaker Dep. pp. 207-208; Bulger Dep. pp. 37-39.) It was reviewed by the same person who concurred in the discharge of Whitaker, Karen Baird. (Bulger Dep. pp. 36-41.)

## ANALYSIS

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if  "the  pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc*., 259 F.3d 558, 566 (6th Cir.2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the non-moving party. See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986);

*McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir.2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.' " *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir.2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the non-moving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir.2002). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Shah v. Racetrac Petroleum Co.*, 338 F .3d 557, 566 (6th Cir.2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the non-moving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the non-moving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th Cir.1999) (citing *Anderson*, 477 U.S. at 247-49).

## TENN. CODE ANN. § 50-1-304 RETALIATORY DISCHARGE

The Whistleblower Act, Tennessee Code Annotated § 50–1–304, provides in pertinent part:

(b) No employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities.

....

(d)(1) Any employee terminated in violation of subsection (b) shall have a cause of action against the employer for retaliatory discharge and any other damages to which the employee may be entitled.

A Whistleblower Act claimant has the burden of proving the following four elements to prevail on his or her statutory retaliatory discharge claim:

(1)     the plaintiff was an employee of the defendant;

(2)     the plaintiff refused to participate in or remain silent about illegal activity;

(3)     the defendant employer discharged or terminated the plaintiff's employment; and

(4)     the defendant terminated the plaintiff's employment solely for the plaintiff's refusal to participate in or remain silent about the illegal activity.

*See Voss v. Shelter Mut. Ins. Co.,* 958 S.W.2d 342, 344 (Tenn.Ct.App.1997).

In this case, the critical element in dispute is element (4)—whether the plaintiff was terminated *solely* for his refusal to participate in or remain silent about the alleged illegal activity, the sales practice of "slamming."  By his own admission in his deposition, the plaintiff has attributed his termination to a "conglomerate of things."

In particular, Plaintiff testified that:

Q.  So why do you think you were terminated?
A.   It never was a hundred percent disclosed to me, but I'm -- I'm assuming it was a -- this Cody Williams thing where I supposedly choked an employee.

Plaintiff also testified that:

> Q.  Do you think the reason you got fired is because you refused to engage in slamming?
> A.  Possibly, yes.  I think that had very -- a lot to do with it, quite a bit.  I mean, primarily I think that's what brought everything to fruition.
> Q.  Do you think it had anything to do with the Cody Williams situation?
> A.  It could have been.  I mean, I think that maybe Jaren's -- I don't know who -- who brought the HR in, if Jaren asked for it, if Cody asked for it.  I do know this, that if Rich would have still been there I -- I don't feel like I'd be sitting here across from you with this situation.  Rich would have, you know -- been a different story.

Plaintiff further testified that:

> Q. Well, you say [in your Complaint] that you felt that Starnes was looking for a reason to terminate you with the underlying reason being your refusal to engage in the slamming.  I think what you're saying is that -- and tell me if I'm wrong.  Are you saying that you thought Starnes' behavior towards you with regard to the key holder situation --
> A.  Not just that, everything.  All this -- this -- this conglomerate of things that happened within that short time span.  I just felt like he was -- he didn't want me there any more.
> …
>
> For all the reasons?
> A.  Well, I mean for that, for -- for the things that -- you  know, other things that I knew about him that he had done behind the scenes, you know, just -- I felt like --
> Q.  Like what?
> A.  When we were going out, he would -- for example, he'd take his ring off, you know, where he was married, like I was going to use that against him or something.  I mean that happened.  So just things like that. I felt like I was sort of a -- not an asset to him, more of a hindrance I guess you could say.  I could potentially be that.  I don't know.

Clearly, the plaintiff has admitted that he was not terminated *solely* for his refusal to

participate in or remain silent about the alleged illegal activity, the sales practice of "slamming."

Therefore, his claim for retaliatory discharge based upon The Whistleblower Act, Tennessee

Code Annotated § 50–1–304, must fail and the defendant's motion for summary judgment in regard to this claim will be granted.

In addition, Tennessee Code Annotated § 50-1-304 (3) defines illegal activities as follows:

> "Illegal activities" means activities that are in violation of the criminal or civil code of this state or the United States or any regulation intended to protect the public health, safety or welfare.

In the alternative, for the reasons set out below in regard to plaintiff's common law retaliatory discharge claim, plaintiff's statutory retaliatory discharge must also fail.

## COMMON LAW RETALIATORY DISCHARGE

Common law retaliatory discharge is analyzed in *Williams v. Greater Chattanooga Public Television Corp.*, 349 S.W.3d 501, 513 (Tenn.Ct.App.,2011):

> A claim of retaliatory discharge is an exception to the employment at will doctrine. A plaintiff seeking to establish a claim for retaliatory discharge under Tennessee common law must prove the following: (1) that an employment-at-will relationship existed; (2) that the employee was discharged; (3) the reason for the discharge was that the employee attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and (4) that a substantial factor in the employer's decision to discharge the employee was the employee's exercise of protected rights or compliance with clear public policy. *Gager v. River Park Hosp.,* M2009–02165–COA–R3–CV, 2010 WL 4244351 at *4 (Tenn.Ct.App. Oct. 26, 2010).

In his complaint, plaintiff alleges that refused to participate in "the practice of slamming which practice is unlawful under the laws of Tennessee and in violation of the established public policy set forth in T.C.A.47-18-104." In his deposition, the plaintiff did not testify that he was terminated because he "attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional,

statutory, or regulatory provision." Rather, he testified that he refused to participate in "slamming" because it was "unethical" and testified in his deposition as follows:

> 81.        In particular, Plaintiff testified that:
>
> Q.    Did you say I think that's a violation of the law or a violation of the --
> A.    I don't know the law. All I said, it's -- it's unethical. I mean, to me that's unethical. I don't know to what extent, law-wise I don't know, but I think if there's a valid option every customer should be presented with every valid option. Let them choose. We don't make up their minds for them.
> Q.    So you don't know if it violates any type of state or federal law or public policy or anything like that?
> A.    No. How should -- I'm sorry.

Whitaker Dep. at 133-34.

The plaintiff now argues that the practice he called "slamming" is more akin to "cramming". Plaintiff explains in fn.3 of his response [Doc. 30]:

> Plaintiff has previously referred to such practices only as "slamming", however after extensive research, Plaintiff now believes that the term "cramming" may be more akin to the practices Starnes encouraged Plaintiff to engage in. "Cramming" is the unauthorized billing for products or services never ordered. "Slamming" is the unauthorized switching of long-distance telephone service.

Plaintiff now contends that "cramming" is an illegal practice and cites statutes and regulations in support of his position. Significantly, plaintiff has never amended his complaint to change "slamming" to "cramming" or to allege the statutes and regulations that he now relies on.

As explained in *Clark v. Hoops, LP.,* 709 F.Supp.2d 657, 670 -671 (W.D.Tenn.,2010):

> Unlike establishing a prima facie case of Title VII retaliation, which is not an "onerous" task, *see Lindsay v. Yates,* 578 F.3d 407, 416 (6th Cir.2009), Tennessee courts have recognized "that [a] plaintiff has indeed a formidable burden in establishing" a prima facie case of retaliatory discharge. *Hill v. Perrigo of Tenn.,* No. M20000–02452–COA–R3–CV, 2001 WL 694479, at *5 (Tenn.Ct.App. June 21, 2001).

Plaintiff alleges that he was terminated for reporting building and safety code violations to the Shelby County building inspector. Plaintiff's retaliatory discharge claim must fail, however, because Plaintiff does not provide the specific statute or regulation upon which he bases his claim. As noted by the Tennessee Court of Appeals, "the [Tennessee Supreme Court] in *Guy v. Mutual of Omaha* stated clearly that [courts] do not simply look at whether a law or regulation has been violated, but 'rather, [the] inquiry focuses on whether some important public policy interest embodied in the law has been furthered' by the employee's actions." *Franklin,* 210 S.W.3d at 532 ( *quoting Guy,* 79 S.W.3d at 538).

The Court in *Clark* concludes:

In the instant case, Plaintiff merely states, in conclusory fashion, that he was terminated for reporting Defendant's "continual violation of building and safety codes." (Def.'s Resp. at 16–17.) Plaintiff's failure to allege a specific statutory or regulatory basis for his claim of retaliatory discharge precludes the Court from determining whether Defendant violated a statute or regulation that implicates (1) "the public health, safety, or welfare" as required by the TPPA or (2) "important public policy concerns" as required by the common law. *See Franklin,* 210 S.W.3d at 529–30. The Court cannot assume that any violation of a statutory or regulatory scheme implicates fundamental public policy concerns. *See id.* at 532 (rejecting the plaintiff's argument that " *any* regulatory infraction by an employer, no matter how minor, can support a claim of retaliatory discharge"); *see also* *671 *VanCleave v. Reelfoot Bank,* No. W2008–01559–COA–R3–CV, 2009 WL 3518211, at *4 (Tenn.Ct.App. Oct. 30, 2009) ("If the statutory or regulatory infraction relied upon by [the plaintiff] does not implicate fundamental public policy concerns, then her claim of retaliatory discharge fails.").

Because Plaintiff has not met his burden of demonstrating that the regulatory infraction allegedly committed by Defendant implicates fundamental public policy concerns, Plaintiff's retaliatory discharge claims must fail.

In this case, Plaintiff has not met his burden of demonstrating that the violation of the

"laws of Tennessee" allegedly committed by defendant, which are alleged in a conclusory

fashion in the complaint, implicate fundamental public policy concerns. Thus, plaintiff's statutory and common law retaliatory discharge claims must fail.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that the defendant's motion for summary judgment in regard to the plaintiff's claim of statutory retaliatory discharge pursuant to Tenn. Code Ann. § 56-7-105, and plaintiff's claim of Tennessee common law retaliatory discharge is **GRANTED**, and the plaintiff's complaint is **DISMISSED**. [Doc. 9].

So ordered.

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE